478 S.E.2d 67

**RAY BELL CONSTRUCTION COMPANY, INC., Appellant,**

v.

**The SCHOOL DISTRICT OF GREENVILLE COUNTY and M.B. Kahn Construction Company, Inc., Respondents.**

**No. 2571.**

Court of Appeals of South Carolina.

Heard Sept. 11, 1996.

Decided Oct. 7, 1996.

Rehearing Denied Nov. 21, 1996.

David B. Summer, Jr. of Nexsen, Pruet, Jacobs & Pollard, Columbia, for appellant.

Theodore S. Stern, Jr., and Thomas E. Dudley, III; and J. Antonio DelCampo of Grant, Leatherwood & Stern; and Donald A. Harper and N. Ward Lambert, both of Harper Law Firm, Greenville, for respondents.

GOOLSBY, Judge:

This case involves a protest by Ray Bell Construction Company (Ray Bell) of the award of a construction contract to M.B. Kahn Construction Company (Kahn) by the Greenville County School District (the school district). The master-in-equity, acting by stipulation of the parties as the administrative review body, affirmed the decision to award the contract to Kahn. Ray Bell sought judicial review of the master's

order and the circuit court affirmed. Ray Bell appeals. We affirm.

## BACKGROUND

In June, 1994, the school district issued its invitation for bids for the construction of the new Greer/Riverside High School. The school district's standard bid form required each general contractor to set forth the names of the subcontractors for each specific portion of the work. The invitation for bids provided that "[i]f the bidder determines to use his own employees to perform any portion of the work for which he would otherwise be required to list a subcontractor, and if the bidder is qualified to perform such work," the bidder could list himself in the appropriate place on the bid form. The bid form also stated that a "[f]ailure to list subcontracts [sic] in accordance with the code shall render the prime contractor's bid unresponsive."

The school district received bids on the project from Ray Bell, Kahn, and Ellis–Don Construction, Inc. Kahn's bid of $18,822,000 was the low bid and Ray Bell's bid of $19,062,000 was the next lowest. At the bid opening, Ray Bell questioned the responsiveness of Kahn's bid because it identified more than one subcontractor and included alternative listings of subcontractors for certain specific portions of the work.

The director of facilities for the school district made an inquiry to Kahn about the questions raised by Ray Bell. By letter dated September 15, 1994, Kahn responded to the inquiry. The school district then issued a notice of intent to award the contract to Kahn. Ray Bell filed a protest with the purchasing agent for the school district pursuant to the school district's procurement code. The purchasing agent denied Ray Bell's protest and Ray Bell appealed the denial. On October 20, 1994, the master-in-equity held an administrative review of the purchasing agent's decision.[1] The master deter-

1. Although the school district's procurement code provided for the appeal of the purchasing agent's decision to the district procurement review panel, no such panel existed at the time of Ray Bell's protest. Ray Bell, therefore, filed a declaratory judgment action against the school district to require the school district to provide the construction company with due process. As a result, Ray Bell, the school district,

mined the purchasing agent acted within his authority and discretion in awarding the contract to Kahn and in denying Ray Bell's protest.

Ray Bell petitioned the circuit court for judicial review of the master's order. Ray Bell argued Kahn's bid was unresponsive because it listed alternative subcontractors and therefore did not conform with either the requirements of the invitation for bids or S.C.Code Ann. § 11–35–3020(2)(b) (Supp. 1995). Based on its interpretation of the language of the statute, the circuit court, in a well-reasoned order, found Kahn's bid did not violate the section.

## DISCUSSION

Ray Bell asserts the circuit court erred as a matter of law in upholding the hearing officer's finding that Kahn complied with both the invitation for bids and the applicable law when it listed alternate subcontractors in its bid. We disagree.[2]

The instructions to bidders provided, in part, that the bid was covered by certain provisions of state law including S.C.Code Ann. § 11–35–3020 (1986 & Supp.1995). The instructions stated:

.1 Any bidder in response to an Invitation for Bids shall set forth in his bid the name of each subcontractor so identified in the Invitation for Bids. If the bidder determines to use his own employees to perform any portion of the work for which he would otherwise be required to list a subcontractor and if the bidder is qualified to perform such work under the terms of the Invitation for Bids, the bidder

and Kahn entered into several stipulations providing the master-in-equity would serve as the designated hearing officer of the district for final administrative review of Ray Bell's protest. The parties agreed the master would have all the authority accorded an administrative agency hearing a bid protest under the school district's procurement code or under the South Carolina Consolidated Procurement Code. The parties further agreed the decision of the master would be the final administrative decision regarding Ray Bell's protest.

2. Because we affirm on this ground, we do not address Ray Bell's remaining arguments. *See Advance Int'l, Inc. v. North Carolina Nat'l Bank of S.C.,* 320 S.C. 533, 466 S.E.2d 367 (1996) (wherein the supreme court vacated an opinion by the court of appeals to the extent certain issues were addressed in dicta).

shall list himself in the appropriate place in his bid and not subcontract any of that work except with the approval of the using Owner for good cause shown.

.2 Failure to list subcontractors in accordance with this section and any regulation which may be promulgated by the State shall render the prime contractor's Bid unresponsive.

S.C.Code Ann. § 11–35–3020(2)(b) (Supp.1995), which is a part of the State Consolidated Procurement Code, provides in part:

(i) The using agency, in consultation with the architect-engineer assigned to the project, shall identify by specialty in the invitation for bids all subcontractors, as defined by applicable documents of the American Institute of Architects, who are expected to perform work or render service to the prime contractor to or about the construction when those subcontractors' contracts are each expected to exceed three percent of the prime contractor's total base bid. In addition, the using agency, in consultation with the architect-engineer assigned to the project may identify by specialty in the invitation for bids any subcontractors who are expected to perform work which is vital to the project. The determination of which subcontractors are included in the list provided in the invitation for bids is not protestable under Section 11–35–4210 or any other provision of this code. Any bidder in response to an invitation for bids shall set forth in his bid the name of each subcontractor so identified in the invitation for bids. If the bidder determines to use his own employees to perform any portion of the work for which he would otherwise be required to list a subcontractor and if the bidder is qualified to perform such work under the terms of the invitation for bids, the bidder shall list himself in the appropriate place in his bid and not subcontract any of that work except with the approval of the using agency for good cause shown.

(ii) Failure to complete the list provided in the invitation for bids renders the bidder's bid unresponsive.

In its bid, Kahn listed subcontractors for various portions of the work. For the roofing work, Kahn listed "Piper or Pickens." For the structural steel work, Kahn listed "G.C. and or McAbee or Falcon." For masonry, Kahn listed "GC

and/or Pettit and/or Brickmaster and/or Marion and/or Byers and/or New Carolina and/or Cherokee and/or Gouch." After Ray Bell questioned these listings, Kahn advised the director of facilities it intended to award the roofing by type with conventional build-up roof system awarded to Piper and metal roofing to Pickens. As for the structural steel and masonry, Kahn indicated it intended to perform the work itself, but would enlist the aid of the subcontractors in the order listed on the form if additional manpower was necessary.

Evidence at the administrative hearing indicated both Piper and Pickens bid for the whole roofing job without breaking it down into smaller components. After Kahn was awarded the contract, it obtained a breakdown from both subcontractors separating the prices for the conventional roofing from the prices for the metal roofing. Kahn decided to award the full roofing subcontract to Piper at Piper's original bid price. Evidence at the administrative hearing also indicated McAbee did not quote the structural steel job to Kahn and, of the seven subcontractors listed for masonry, only Pettit gave Kahn a bid for the whole job. The master found Kahn awarded the subcontracts to the subcontractors listed on its bid at the prices originally submitted by the subcontractors, except for the steel erection and masonry, which it intended to perform itself. The master also concluded Kahn did not bid shop and offered credible reasons for listing multiple subcontractors.

Ray Bell argues Kahn's alternative listing of subcontractors for portions of the work violates the invitation for bids and section 11–35–3020 because Kahn failed to specify prior to bid opening which subcontractors it would use to perform work on the project. Ray Bell contends the manner in which Kahn listed its subcontractors allowed Kahn to choose the subcontractors it would use after it was awarded the contract, thereby creating a situation that fostered post-award bid shopping in violation of the intent of the law. According to Ray Bell's argument, Kahn's ultimate intentions in listing more than one subcontractor are not relevant because Kahn's bid violated the subcontractor listing law on its face.

The determination of legislative intent is a matter of law. *Charleston County Parks & Recreation Comm'n v. Somers,*

319 S.C. 65, 459 S.E.2d 841 (1995). If a statute's language is plain and unambiguous and conveys a clear and definite meaning, there is no occasion for employing rules of statutory interpretation and the court has no right to look for or impose another meaning. *Paschal v. State Election Comm'n*, 317 S.C. 434, 454 S.E.2d 890 (1995). The appellate court cannot construe a statute without regard to its plain and ordinary meaning and may not resort to subtle or forced construction in an attempt to limit or expand its scope. *Id.* at 436–37, 454 S.E.2d at 892.

 We agree with the circuit court's conclusion that the express language of section 11–35–3020(2)(b) provides the failure *to complete* the list in the invitation for bids renders the bidder's bid unresponsive. The clear language of the statute, however, does not state that listing of alternative subcontractors renders the bid unresponsive. Moreover, in such a case the court cannot rewrite the statute and inject into it matters not in the legislature's language. *Timmons v. South Carolina Tricentennial Comm'n*, 254 S.C. 378, 175 S.E.2d 805 (1970), *cert. denied*, 400 U.S. 986, 91 S.Ct. 460, 27 L.Ed.2d 435 (1971). Kahn's listing of alternative subcontractors, therefore, did not render its bid unresponsive under section 11–35–3020(2)(b). *See Thomas P. Carney, Inc. v. City of Trenton*, 235 N.J.Super. 372, 562 A.2d 807, 811 (App.Div. 1988) ("[i]f the Legislature perceives a need to either ban the use of multiple subcontractors within a given trade, or require that each subcontractor named receive a contract, or impose conditions on the use of such a bid, we are confident that it will enact the necessary legislation to amend the statute.").[3]

AFFIRMED.

---

**3.** Ray Bell and the dissent both rely on *Prismatic Dev. Corp. v. Somerset County Bd. of Chosen Freeholders*, 236 N.J.Super. 158, 564 A.2d 1208 (App.Div.1989). Their dependence on *Prismatic* is unjustified. The court in that case interpreted the New Jersey bid statute by relying heavily upon extensive legislative history and a governor's veto. *Id.* 564 A.2d at 1211–12. Unlike the court in *Prismatic*, but similar to the case here, the court in *Thomas P. Carney, Inc. v. City of Trenton*, 235 N.J.Super. 372, 562 A.2d 807, 811 (App.Div.1988), did not consider legislative history. Indeed it would be inappropriate in this case to consider extrinsic matters because as we mentioned above the language of the statute in issue is clear and unambiguous. *See* 73 Am.Jur.2d *Statutes* § 151, at 355–56 (1974) ("where the language of a statute is

STILWELL, J., concurs.

CURETON, J., dissents in a separate opinion.

CURETON, Judge: (dissenting).

I respectfully dissent from the majority's opinion. First, I would hold that the bid of M.B. Kahn Construction Company, Inc. ("Kahn") violates the applicable statutes. Second, I would hold that the School District of Greenville County ("District") had no authority to waive this violation. Finally, I would remand the case to the hearing officer.

## I.

Ray Bell Construction Company, Inc. ("Bell") contends that Kahn's bid is unresponsive on its face because it violates the South Carolina Consolidated Procurement Code ("Procurement Code"). The Procurement Code sets forth a comprehensive scheme to ensure a fair and deliberative process when awarding public construction contracts. *See* S.C.Code Ann. § 11–35–10 et seq. (Rev.1986 and Supp.1995). To such an end, the Code provides in pertinent part:

the using agency ... shall identify by specialty in the invitation for bids all subcontractors ... who are expected to perform work or render service to the prime contractor ... when those subcontractor's contracts are each expected to exceed three percent of the prime contractor's total base bid.... Any bidder in response to an invitation for bids shall set forth in his bid the name of each subcontractor so identified in the invitation for bids. If the bidder determines to use his own employees to perform any portion of the work for which he would otherwise be required to list a subcontractor ..., the bidder shall list himself in the appropriate place in his bid and not subcontract any of that work

unambiguous, consideration of the history of the legislation is not permissible.")

As we have done here, the court in *Carney* refused to "rewrite the law to include therein something which those charged with the legislative responsibility *might* have inserted if the matter had been called to their attention." *Carney*, 562 A.2d at 811 (quoting *Township of Brick v. Spivak*, 95 N.J.Super. 401, 231 A.2d 380 (App.Div.1967)).

except with the approval of the using agency for good cause shown.

S.C.Code Ann. § 11–35–3020(2)(b)(i) (Supp.1995). Moreover, "failure to complete the list provided in the invitation for bids renders the bidder's bid unresponsive." S.C.Code Ann. § 11–35–3020(2)(b)(ii) (Supp.1995). Finally, the statute prevents a general contractor whose bid is accepted from substituting a new subcontractor for the listed subcontractor, unless the general contractor is able to show one of several enumerated circumstances.[1] S.C.Code Ann. § 11–35–3020(2)(b)(iii) (Supp. 1995). Based on these statutory provisions, I would hold that listing multiple and alternative subcontractors violates the Procurement Code, unless the listed subcontractors are to share the job or the selection of one of the subcontractors depends on post-bid action by the using agency.

First, the policies behind the Procurement Code are at odds with Kahn's submission of multiple and alternate subcontractor listings. The Legislature enacted the Procurement Code in order to "ensure the fair and equitable treatment of all persons who deal with the procurement system." S.C.Code Ann. § 11–35–20(f) (Supp.1995). Further, the Legislature intended a "system of quality and integrity with clearly defined rules for ethical behavior." S.C.Code Ann. § 11–35–20(g) (Supp.1995). Most importantly, the Legislature desired "to maximize to the fullest extent practicable the purchasing values of [State] funds," and "to foster effective broad-based competition." S.C.Code Ann. § 11–35–20(a), (b) (Supp.1995). Consistent with these policies, the main purpose of the listing provisions in subsection 11–35–3020(2)(b) is to prevent the unethical practices of bid shopping and bid peddling. Bid

---

1. The statute permits substitution of a subcontractor if the general contractor can show: (a) that the subcontractor is financially irresponsible, (b) that the subcontractor's bid did not include a portion of the work required by the plans and specifications, (c) within four days of bid opening, that the subcontractor was listed because of clerical error, (d) that the subcontractor failed to provide a performance and payment bond after representing that it could, (e) that the subcontractor is unlicensed, (f) that the listed subcontractor fails or refuses to perform the work, (g) that the subcontractor's work is "substantially unsatisfactory," (h) that the contractor and subcontractor mutually agreed to substitution, or (i) that the general contractor has good cause for substitution. *See* S.C.Code Ann. § 11–35–3020(2)(b)(iii)(a)–(i) (Supp. 1995).

shopping occurs when the general contractor uses the low bid received from one subcontractor to pressure other subcontractors into reducing their bids. *See Romero Excavation and Trucking, Inc. v. Bradley Constr., Inc.,* 121 N.M. 471, 913 P.2d 659, 662 (1996) (quoting *Southern California Acoustics Co. v. C.V. Holder, Inc.,* 71 Cal.2d 719, 79 Cal.Rptr. 319, 325 n. 7, 456 P.2d 975, 981 n. 7 (1969)). Bid peddling occurs when subcontractors become aware of the .lowest bid submitted to the general contractor and attempt to obtain the job with a lower bid. *Id.* These practices have a number of ill effects, but bid shopping and bid peddling almost always result in an increase in the general contractor's profit margin, rather than a savings to the awarding agency.[2]

In the present case, Kahn's listing does not meet the statutory standard for responsiveness because the listing necessarily requires post-award arrangements. While Kahn ultimately awarded the roofing subcontract to Piper at Piper's original bid price, Kahn only made the award after it received a post-award breakdown from both subcontractors which separated the metal roofing price from the conventional roofing price. Kahn listed itself, McAbee, or Falcon for the structural steel work, but Kahn received no bid whatsoever from McAbee before the award, and Kahn used its own price estimate in calculating its ultimate bid. For the masonry work, Kahn listed itself as well as seven subcontractors. Kahn again used its own price for calculating the ultimate bid, because only one subcontractor had given a bid price before the award, and the

---

**2.** The unethical practices of bid shopping and bid peddling cause: (a) subcontractors to artificially paid their initial bids in anticipation of post-award negotiations, (b) subcontractors to either take the job at a loss or to do shoddy work, (c) subcontractors to face an increased risk of losing bid preparation time and money if their bids are used by general contractors to pressure other subcontractors, (d) general contractors to have less than adequate time to prepare bids because subcontractors wait until the last minute to submit subbids in order to prevent pre-award bid shopping, (e) some subcontractors to refuse to submit bids if they anticipate bid shopping, thus reducing competition, and (f) the awarding agency to lose and the general contractor to gain any savings from bid shopping and peddling. The awarding authority ultimately loses in a post-award bid shopping situation. *See* Thomas P. Lambert, Comment, *Bid Shopping and Peddling in the Subcontract Construction Industry,* 18 U.C.L.A.Law.Rev. 389, 395–97, 396 n. 30 (1970).

other six subcontractors either were unit subcontractors or merely had expressed interest in the project. This sort of "shotgun" approach to subcontractor listing necessarily involves post-award discussion if not negotiation, which in turn raises the potentiality of bid shopping and bid peddling. While the record does not reflect that Kahn engaged in any bid shopping or that the subcontractors engaged in any bid peddling, those facts alone do not change my analysis.[3] The Procurement Code's procedure should not tolerate any appearance of impropriety, and other bidders should not be required to file protests and actually "catch" the winning contractor in bid shopping in order for a haphazard bid such as Kahn's to be declared unresponsive under the statute.

Second, the circuit court and Kahn's interpretation of subsection 11–35–3020(2)(b) would make other portions of that subsection superfluous. The circuit court held, and Kahn argues, that only the failure to list any subcontractor for a particular speciality renders a bid unresponsive. However, if Kahn could simply choose after the award from a listing of itself as well as a number of subcontractors, then a portion of subsection 11–35–3020(2)(b)(i) would be meaningless. That subsection prohibits the general contractor from substituting subcontractors for itself without good cause. If Kahn's interpretation is correct, then a general contractor would have no reason to only list itself and thus be bound to do the job unless it later could show good cause. For the same reason, Kahn's interpretation would vitiate subsection 11–35–3020(2)(b)(iii)'s list of permitted reasons for a general contractor to substitute another company in the place of a listed subcontractor. Again, it is unlikely a general contractor would commit itself to one subcontractor if it could list many and avoid having to show the special circumstances needed for post-award substi-

---

3. Kahn did provide a letter that the District requested explaining why Kahn listed multiple and alternative subcontractors. However, the record reflects that Kahn did not ultimately award subcontracts as explained in the letter. In any event, Kahn's actions, intentions, and explanations do not save a bid which is facially violative of the listing statutes. *Cf. William C. Logan & Assoc. v. Leatherman*, 290 S.C. 400, 351 S.E.2d 146 (1986) (noting that it is irrelevant whether a contractor who failed to list a subcontractor for a specialty ultimately intended to obtain additional future bids in such a manner as to prevent the subcontractor's bid from exceeding the threshold amount for listing).

tution. It is axiomatic that a statute will not be construed in a manner which will render other portions superfluous. *See Bunch v. Cobb,* 273 S.C. 445, 451, 257 S.E.2d 225, 228 (1979). It is further congruent with legislative intent that a general contractor not be able to simply open the telephone book and list all subcontractors in a speciality without regard for whether it intended to use any of them on a job. While Kahn's actions may have involved at least some sort of contact with the listed subcontractors, clearly all of them were not "expected to perform work or render service" for Kahn. *See* S.C.Code Ann. § 11–35–3020(2)(b)(i) (Supp.1995).

Third, the majority's reliance on *Thomas P. Carney, Inc. v. City of Trenton,* 235 N.J.Super. 372, 562 A.2d 807 (App.Div. 1988) is misplaced. The majority relies on *Carney* for the proposition that the legislature can enact the necessary legislation if it wishes either to prevent the listing of multiple contractors or to require the awarding of a contract to the listed subcontractor. However, *Carney* was subsequently explained and narrowed by *Prismatic Dev. Corp. v. Somerset County Bd. of Chosen Freeholders,* 236 N.J.Super. 158, 564 A.2d 1208 (App.Div.1989), *overruled on other grounds by Meadowbrook Carting Co., Inc. v. Borough of Island Heights,* 138 N.J. 307, 650 A.2d 748 (1994). In *Prismatic,* the court noted that *Carney* only meant general contractors could list multiple subcontractors if they were to share the work. *Id.* 564 A.2d at 1212. Further, the *Prismatic* court interpreted *Carney* as authorizing the listing of alternate subcontractors if the general contractor's selection would depend on a post-award decision by the awarding authority. *Id.* The *Prismatic* court expressly rejected the contention that the general contractor could list multiple and alternative subcontractors and then select from among them after the awarding agency accepted the bid. *Id.* While it is true that the *Prismatic* court was guided by some rather explicit legislative intent as well as a veto,[4] I would hold that *Prismatic's* rules apply to

---

4. The Governor of New Jersey conditionally vetoed legislation that would have allowed post-award selection of subcontractors. *Prismatic,* 564 A.2d at 1211–12. In his recommendation to the New Jersey Legislature, the Governor noted that "[i]f a general contractor could wait to name subcontractors until after he has submitted his bid to the local unit of government, then the local unit of government would be

subsection 11–35–3020(2)(b). If multiple subcontractors are to share the job, or if the selection of one or more of them depends on post-award action by the awarding agency, then the listing statute is not violated. The *Prismatic* rules remove the potential for bid shopping and bid peddling because the general contractor does not have the discretion to substitute after the award without complying with the statutory provisions. *See also Dynacon, Inc. v. D & S Contracting, Inc.,* 120 N.M. 170, 899 P.2d 613 (Ct.App.1995) (holding that while the bid shopping problem would arise if general contractors list multiple subcontractors for post-award selection, the problem would not arise if the listing reflects that the post-award selection is contingent upon the awarding agency's choice from different bid lots). Since Kahn's listing contemplated unfettered post-award selection of subcontractors, I would hold its bid unresponsive.

## II.

Bell next challenges the circuit court's affirmance of the hearing officer's finding that, in any event, the District had the authority to waive the unresponsiveness of Kahn's bid. I agree with Bell that the District cannot waive the problems in Kahn's bid. Admittedly, the Procurement Code allows the awarding agency to waive "minor informalities or irregularities with bids," which are defined as problems that are:

> ... merely a matter of form or [are] some immaterial variation from the exact requirements of the invitation for bids having no effect or merely a trivial or negligible effect on total bid price, quality, quantity, or delivery of the supplies or performance of the contract, and the correction or waiver of which would not affect the relative standing of, or be otherwise prejudicial to, bidders.

S.C.Code Ann. § 11–35–1520(13) (Supp.1995). The statute provides examples of minor irregularities which include failure to sign the bid in certain circumstances, failure to return the requested number of copies, and failure of the bidder to furnish its bidder number. *Id.* Further, the District's procurement code substantially tracks the language of the statute

---

unlikely to benefit from any bid shopping undertaken by the general contractor in securing the performance of subcontractors." *Id.*

in defining waivable errors. The invitation for bids provides that the District will not reject bids for immaterial variations; however, the invitation also states that the District will reject bids for "failure to list subcontractors as required by law." A fair reading of the Procurement Code, the District's procurement code, and the invitation for bids shows that the listing of multiple subcontractors in the disjunctive is not waivable as a minor informality or irregularity. The District cannot waive Kahn's listing of alternative subcontractors, because post-award selection raises the potentiality of bid shopping and bid peddling. Bid shopping and bid peddling are the heart of the evil to be prevented by the listing provisions.

### III.

Bell also contends that the hearing officer had neither jurisdiction nor evidence to conclude that Bell's bid was not responsive. Since no other bidder had protested its bid, Bell argues that the hearing officer had no right to consider Bell's responsiveness. Further, Bell argues that its due process rights were violated because it did not know that the hearing officer was considering Bell's bid until after the officer filed his order. Kahn responds by citing cases from other jurisdictions which hold that a protesting bidder must show a substantial likelihood of receiving the contract in order to challenge the responsiveness of the low bid.[5] I would remand the issue to the hearing officer.

Section XIII.A.7 of the District's procurement code provides that the "District Procurement Review Board may order the computation and award of a reasonable reimbursement amount including reimbursement of bid preparation costs, and [the Board] may order such other and further relief as justice dictates, including but not limited to a re-award of the contract or a re-bid of the contract."[6] Since I would hold Kahn's bid to be unresponsive, I would remand this case to the hearing

---

5. *See, e.g., AT & T Technologies, Inc. v. United States,* 18 Cl.Ct. 315 (1989); *Caddell Constr. Co./Ise Construzioni, S.p.A. v. United States,* 9 Cl.Ct. 610 (1986).

6. As noted by the majority, a master was appointed as the designated hearing officer because a District Procurement Review Board was not in existence at the time of Bell's protest.

officer for a determination of the appropriate remedies pursuant to the District's procurement code.