501 S.E.2d 725

**RAY BELL CONSTRUCTION COMPANY, INC., Petitioner,**

v.

**The SCHOOL DISTRICT OF GREENVILLE COUNTY and M.B. Kahn Construction Company, Inc., Respondents.**

No. 24790.

Supreme Court of South Carolina.

Heard March 5, 1998.

Decided May 18, 1998.

David B. Summer, Jr., and Faye A. Flowers, of Parker Poe Adams & Bernstein, L.L.P., Columbia, for petitioner.

Donald A. Harper and N. Ward Lambert, of The Harper Law Firm, Greenville, for respondent Greenville County School District.

Theodore S. Stern, Jr., and Thomas E. Dudley, III, of Covington, Patrick, Hagins, Stern & Lewis, P.A., Greenville, for respondent M.B. Kahn Construction Company, Inc.

WALLER, Justice:

We granted certiorari to review the Court of Appeals' decision in *Ray Bell Const. Co. v. School Dist. of Greenville Cty.*, 324 S.C. 320, 478 S.E.2d 67 (1996). We reverse and remand.

### FACTS/PROCEDURAL POSTURE

In June 1994, Respondent Greenville County School District ("District") issued an Invitation for Construction Bids on a new high school. Three contractors submitted bids for the project: (1) Respondent M.B. Kahn Construction Company, Inc. ("Kahn"); (2) Petitioner Ray Bell Construction Company, Inc. ("Ray Bell"); and (3) Ellis–Don Construction, Inc. When bids were opened, Kahn's was the lowest, some $240,000 lower than Ray Bell's.[1] Ray Bell questioned the responsiveness[2] of Kahn's bid because Kahn had listed multiple subcontractors in the alternative for the same specialty work on its bid form.

District required contractors to list subcontractors for fifteen separate specialties. Ray Bell's complaint involves Kahn's listings in five areas:

*ROOFING:* "Piper or Pickens"

---

1. Ellis–Don was the highest bidder and is not a party to this action.

2. According to District's Procurement Code, contracts "shall be awarded ... to the lowest responsible and responsive bidder whose bid meets the requirements and criteria set forth in the invitation for bids...."

*STRUCTURAL STEEL:* "G.C. [general contractor, i.e. Kahn] and or McAbee or Falcon"

*MASONRY:* "GC and/or Pettit and/or Brickmaster and/or Marion and/or Byers and/or New Carolina and/or Cherokee and/or Goucher"

*TERRAZZO/HARD TILE:* "Campbell Tile or Capital/Adams"

*HVAC CONTROLS:* "Barber Coleman or ACTS."

In response to Ray Bell's questions, District requested an explanation from Kahn for its listings. Kahn made the following representations by letter. For roofing, Kahn stated it listed two subcontractors because it intended to award roofing by type: conventional built-up roofing to Piper and metal roofing to Pickens. For Structural Steel and Masonry, Kahn stated it intended to do the work itself, and would enlist the aid of additional subcontractors should they be needed to complete the work on schedule. For Terrazzo/Hard Tile, Kahn stated it intended to award terrazzo and ceramic tile separately: terrazzo to Campbell "and the ceramic tile to be awarded next in accordance with our proposal." For HVAC Controls, Kahn stated it was necessary to list two subcontractors "due to the proprietary nature of certain aspects of the controls systems depending on equipment selection."

After reviewing Kahn's written explanation, District issued a notice stating it intended to award Kahn the contract. Ray Bell then filed a formal protest with District's purchasing agent. The purchasing agent denied the protest, stating that based on Kahn's written explanation, " 'bid shopping' is neither contemplated nor possible." The same day of this denial, District awarded Kahn the contract. Ray Bell appealed the purchasing agent's decision. The matter was subsequently set before a master-in-equity [3] for an administrative hearing.

---

3. District's Procurement Code provides its "Procurement Review Board" is charged with responsibility for providing administrative review of protests arising from contract awards. Thus, when Ray Bell filed its request for review of the purchasing agent's decision, the matter should have been heard by this Board. However, at the time there was no active District Procurement Review Board. Therefore, in an unusual agreement, all parties stipulated the matter would be heard by a master-in-equity, who would have all rights and powers of any administrative body authorized to hear the protest. The presiding

At the hearing, held seventeen days after Kahn received the contract award, Kahn gave further information regarding the subcontractor listings. Regarding the roofing, Kahn represented it did not get breakout bids (broken down into built-up and metal) from Piper or Pickens until after it received the contract. Prior to that, it only had bids for the whole project. It used Piper's sub-bid in its bid calculation. After receiving the breakout bids post-award, Kahn decided to award the entire job to Piper.

Regarding structural steel and masonry, Kahn maintained it still intended to do the work itself, and would get District approval (i.e. comply with S.C.Code Ann. § 11–35–3020(2)(b)(ii), quoted below, regarding self-bidding) before resorting to subcontractors. Regarding terrazzo/hard tile, Kahn represented Campbell gave a pre-award bid, broken down into terrazzo and hard tile. Capital gave a pre-award bid for the hard tile only. Adams originally bid for both terrazzo and hard tile, but withdrew its bid at some point (the record is unclear whether this occurred pre- or post-award). Finally, regarding the HVAC controls, Kahn stated in actuality this subcontractor is chosen by the mechanical subcontractor, (i.e. it would be a "sub's sub"). Therefore, Kahn had no control over that award. It received no quotes from either Barber Coleman or ACTS, and its listed mechanical subcontractor did not provide these names. Kahn stated it had ultimately awarded subcontracts to those subcontractors who submitted the lowest pre-award bid. Kahn also denied it ever shopped bids.

After the hearing, the master denied Ray Bell's protest. The circuit court affirmed. The Court of Appeals likewise affirmed. *Ray Bell Const. Co. v. School Dist. of Greenville Cty.*, 324 S.C. 320, 478 S.E.2d 67 (Cureton, J., dissenting).

We granted certiorari.

---

circuit court judge agreed to this stipulation and reference, further providing any appeal of the master's decision would be to circuit court. We make no representations regarding the propriety of a judicial officer hearing this case in an administrative capacity.

## ISSUES

I. Does state law prohibit the listing of alternate subcontractors in bid forms?

II. If listing alternate subcontractors is improper, can doing so constitute a minor informality such that District could waive it?

## DISCUSSION

### Standard of Review

Under District's Procurement Code, factual determinations required by competitive sealed bidding "shall be final and conclusive unless they are clearly erroneous, arbitrary, capricious or contrary to law." "No determination by the Review Panel or Board concerning an issue of law shall be final or conclusive."

### I. Statutory Construction of S.C.Code Ann. § 11–35–3020

Ray Bell argues S.C.Code Ann. § 11–35–3020(2)(b) prohibits the listing of multiple subcontractors in the alternative on bid forms. Under the circumstances that exist in this case, we agree. In 1994, this section provided, in pertinent part:

(b) Bid Acceptance. ... The using agency's invitation for bids shall set forth all requirements of the bid including, but not limited to:

(i) The using agency ... shall identify by specialty in the invitation for bids all subcontractors ... who are expected to perform work or render service to the prime contractor to or about the construction when those subcontractors' contracts are each expected to exceed three percent of the prime contractor's total base bid. In addition, the using agency ... may identify by specialty in the invitation for bids any subcontractors who are expected to perform work which is vital to the project. The determination of which subcontractors are included in the list provided in the invitation for bids is not protestable under Section 11–35–4210 or any other provision of this code. **Any bidder in response to an invitation for bids shall set forth in his bid the name of each subcontractor so identified in the invitation for bids.** If the bidder determines to use his own employees to perform any portion of the work for

which he would otherwise be required to list a subcontractor and if the bidder is qualified to perform such work under the terms of the invitation for bids, the bidder shall list himself in the appropriate place in his bid and not subcontract any of that work except with the approval of the using agency for good cause shown.

(ii) Failure to complete the list provided in the invitation for bids renders the bidder's bid unresponsive.

(iii) No prime contractor whose bid is accepted shall substitute any person as subcontractor in place of the subcontractor listed in the original bid, except for one or more of the following reasons: [subcontractor (a) is financially irresponsible, (b) did not properly bid to contractor, (c) was inadvertently listed due to clerical error, (d) has not submitted required bond, (e) is not licensed as required by law, (f) fails to perform contract, (g) is doing unsatisfactory work (h) has agreed to substitution, (h) with using agency's consent upon good cause shown]. The request for substitution must be made to the using agency in writing.

(iv) Where substitution is allowed, the prime contractor, before obtaining prices from any other subcontractor, must attempt in good faith to negotiate a subcontract with at least one subcontractor whose bid was received prior to the submission of the prime contractor's bid.

(emphasis supplied).[4]

In disagreeing with Ray Bell's argument, the Court of Appeals stated: "... the express language of section 11–35–3020(2)(b) provides the failure *to complete* the list in the invitation for bids renders the bidder's bid unresponsive. The clear language of the statute, however, does not state that listing of alternative subcontractors renders the bid unresponsive." *Ray Bell Const. Co.*, 324 S.C. at 326, 478 S.E.2d at 70. In essence, the Court of Appeals reasoned if the legislature did not expressly prohibit such listings, they were permissible. In doing so, it relied on a strict rule of statutory construction:

If a statute's language is plain and unambiguous, and conveys a clear and definite meaning, there is no occasion for

---

4. District made these provisions applicable to the bids submitted for this project by including them in its Instructions to Bidders and Invitation for Bids.

26

employing rules of statutory interpretation and the court has no right to look for or impose another meaning. Where the terms of the statute are clear, the court must apply those terms according to their literal meaning. This Court cannot construe a statute without regard to its plain and ordinary meaning, and may not resort to subtle or forced construction in an attempt to limit or expand a statute's scope.

*Paschal v. State Elec. Comm'n,* 317 S.C. 434, 436–37, 454 S.E.2d 890, 892 (1995). The Court of Appeals found the language of section 11–35–3020(2)(b) unambiguous, and thus refused to resort to other rules of statutory construction.

 The question of whether a statute's language is unambiguous and conveys a clear and definite meaning is not always an easy one. We find the Court of Appeals erred in focusing only on section 11–35–3020(2)(b)(ii) in construing the statute's meaning.[5]

All rules of statutory construction are subservient to the one that the legislative intent must prevail if it can be reasonably discovered in the language used, **and that language must be construed in the light of the intended purpose of the statute.** However plain the ordinary meaning of the words used in a statute may be, the courts will reject that meaning when to accept it would lead to a result so plainly absurd that it could not possibly have been intended by the Legislature or would defeat the plain legislative intention. If possible, the court will construe the statute so as to escape the absurdity and carry the intention into effect.

*Kiriakides v. United Artists Communications, Inc.,* 312 S.C. 271, 275, 440 S.E.2d 364, 366 (1994) (internal citations omitted) (emphasis supplied).

Allowing the listing of alternate subcontractors would conflict with the overall purpose behind section 11–35–3020(2)(b). As Judge Cureton discussed at length in his dissent, the

---

5. We also disagree with the Court of Appeals' reasoning to the extent it suggests the sole criteria of responsiveness is contained in this statute. District's bidding requirements provide that a bid will be unresponsive if it does not comply with applicable state law. Thus, if the listing of multiple subcontractors in the alternative violates state law, the bid can be considered unresponsive despite section 11–35–3020's failure to so specifically provide.

underlying goals of the State Procurement Code are, *inter alia*, to ensure standards for the "fair and equitable treatment of all persons" dealing with public procurement, establish a "system of quality and integrity with clearly defined rules for ethical behavior on the part of all persons engaged in the public procurement process," and "foster effective broad-based competition." S.C.Code Ann. § 11–35–20 (Supp.1997). These goals are to be furthered while maximizing, "to the fullest extent practicable[,] the purchasing values of [public] funds." *Id.*[6] To these ends, a primary objective of the bid listing provisions, particularly regarding subcontractors, is to prevent bid shopping and peddling.[7] Allowing the listing of alternate subcontractors would only serve to foster these unethical practices because it would give contractors the opportunity to choose from among several prospective subcontractors, depending on who offered the lowest bid **post-award.**

Additionally, the strict substitution requirements of section 11–35–3020(2)(b) would be rendered virtually meaningless under the Court of Appeals' interpretation. These provisions allow subcontractor substitutions only with prior approval of the using agency and in certain limited circumstances. However, if a contractor could list subcontractors in the alternative on the bid form and then make its choice post-award, these substitution requirements could be completely circumvented. "In construing statutory language, the statute must be read as a whole, and sections which are part of the

---

6. District's Procurement Code has incorporated these policies into its provisions as well.

7. "Bid shopping is the use by the general of one subcontractor's low bid as a tool in negotiating lower bids from other subcontractors. Bid peddling, conversely, is the practice whereby subcontractors attempt to undercut known bid prices of other subcontractors in order to get a job. In most circumstances, bid peddling is simply a response of competing subcontractors to the bid shopping activity of a general, and insofar as a solution to this problem is concerned, bid shopping and peddling may be treated as one." Thomas P. Lambert, Comment, *Bid Shopping and Peddling in the Subcontract Construction Industry*, 18 UCLA L.Rev. 389, 394 (1970). Bid shopping allows a bidder "to be in a position to increase his profit, often to the detriment of the project itself, by forcing subcontractors to provide services at destructively low prices in order to obtain work." *George & Lynch, Inc. v. Division of Parks and Rec.*, 465 A.2d 345, 349 n. 4 (Del.1983).

same general statutory law must be construed together and each one given effect, if it can be done by any reasonable construction." *Higgins v. State*, 307 S.C. 446, 449, 415 S.E.2d 799, 801 (1992). *See also Jackson v. Charleston Cty. Sch. Dist.*, 316 S.C. 177, 181, 447 S.E.2d 859, 861 (1994) ("The true guide to statutory construction is not the phraseology of an isolated section or provision, but the language of the statute as a whole considered in the light of its manifest purpose.").

 A Pennsylvania court reasoned, in interpreting similar subcontractor listing requirements contained in bid instructions: "Although it is true that the bid instructions do not expressly forbid alternative listings, it is also true that the apparent intent of the language 'to identify the equipment and material which has been used by [the contractor] as a base bid . . .' together with another requirement that no modifications would be allowed after bid opening, makes the most reasonable interpretation seem to be that only one listing would be permitted, and that was in fact how all the other bidders understood the instruction." *Conduit & Found. Corp. v. City of Philadelphia*, 41 Pa.Cmwlth. 641, 401 A.2d 376, 379 (1979).[8]

---

**8.** In reaching its decision, the Court of Appeals relied on *Thomas P. Carney, Inc., v. City of Trenton*, 235 N.J.Super. 372, 562 A.2d 807 (App.Div.1988). In *Carney*, a bid was submitted listing multiple subcontractors for one specialty. Carney argued this violated applicable law requiring bidders to give "the name or names of all subcontractors to whom the bidder will subcontract." The court disagreed, finding, "The 'one subcontractor to a trade' rule contended by Carney is simply not found in the text of the statute. If the drafters of the statute intended to prohibit general contractors from using multiple subcontractors in each trade, we assume more precise wording would have been used." *Id.* at 810. *Carney* held the statute neither prohibited a bidder from contracting with more than one subcontractor in a trade, nor required each subcontractor named actually receive a contract. "The purpose of the word 'will' in the statute is to prevent substitutions of unlisted subcontractors, not to guarantee that each listed subcontractor receive a contract." *Id.*

*Carney's* holding was subsequently limited by *Prismatic Dev. Corp. v. Somerset Cty. Bd. of Chosen Freeholders*, 236 N.J.Super. 158, 564 A.2d 1208 (App.Div.1989), *cert. denied*, 118 N.J. 205, 570 A.2d 965 (1989), *and overruled on other grounds by Meadowbrook Carting Co. v. Borough of Island Heights*, 138 N.J. 307, 650 A.2d 748 (1994). *Prismatic* also addressed whether contractors could name alternative specialty subcontractors under the same statute analyzed in *Carney*. Relying in part on legislative history, but also in part on statutory language, *Prismatic* held it was impermissible "to name multiple subcontractors for some

We find section 11–35–3020 prohibits the listing of multiple subcontractors in the alternative on a bid. However, our holding is not intended to proscribe listing multiple subcontractors when more than one subcontractor is actually going to perform the work (i.e. the job will be shared), or when the award of subcontractors will depend on some post-award action by the awarding agency. *See Ray Bell Const. Co.*, 324 S.C. at 331–32, 478 S.E.2d at 73 (Judge Cureton, dissenting); *Prismatic Dev. Corp.*, 236 N.J.Super. 158, 564 A.2d 1208.[9] Under the circumstances of this case, we find Kahn improperly listed subcontractors on its bid form because it provided the opportunity to choose from among several subcontractors post-award.[10]

---

(or all) of the branches of work and then select between them after the opening of bids." *Id.*, 364 A.2d at 1212. In so holding, it factually distinguished *Carney:* "In that case ... the contracting unit's bid request contained a number of alternative proposals, all of which were to be provided for in the bids. The prime contractor, in a single overall contract bid, named more than one subcontractor for the same trade *but was really required to do so because the selection of the subcontractor depended upon what the contracting unit ultimately decided to do." Id.*, 364 A.2d at 1210 (emphasis supplied). *Carney* can be similarly distinguished here, a fact the Court of Appeals ignored.

9. Section 11–35–3020(2)(b)(i) was amended in 1997, after the Court of Appeals issued its decision in this case. It now reads in pertinent part: "Any bidder in response to an invitation for bids shall set forth in his bid the name of only those subcontractors that will perform the work as identified in the invitation for bids." (emphasis supplied to reflect amendment). We do not suggest this amendment should be read as an indication of legislative intent in enacting the statute we interpret today. *See Whitner v. State*, 328 S.C. 1, 492 S.E.2d 777 (1997) (Generally, the legislature's subsequent acts cast no light on the intent of the legislature which enacted the statute being construed).

10. Neither of the limitations to our holding applies in this case. We do take note of Kahn's initial, pre-award representations that the two roofing subcontractors would share the work. Had that been the case, a good argument exists this listing would not have violated section 11–35–3020. However, this is not what ultimately occurred. Kahn used Piper's whole bid in computing its bid offer. It admitted at the hearing it never asked for a break-out bid from either Piper or Pickens until after it was awarded the contract (and after it responded to District's inquiry). After receiving the break-out bids, it decided to use Piper for the whole project, ostensibly because Pickens bid too high. It is difficult to understand how a contractor could have intended to award subcontracts separately by type when it never had break-out bids. While Kahn may not have actually shopped its bid, it appears by its

██ In finding Kahn's bid complied with applicable law, the master seemed to focus on the fact that (1) it did not appear Kahn actually "shopped" its bid among subcontractors, and (2) Kahn ultimately awarded subcontracts to those subcontractors who gave the lowest pre-award bids. His reasoning was that if the underlying policy of section 11–35–3020 is to prevent bid shopping, and no bid shopping actually occurred, then Kahn effectively complied with the statute.[11] We disagree with this reasoning. Section 11–35–3020(2)(b) is a bid **listing** statute. Although the legislature could have written a statute directly prohibiting bid shopping, it chose instead to adopt preventive measures regulating conduct which provides the opportunity to engage in unethical practices.[12] We find that to establish a violation of section 11–35–3020, proof of actual bid shopping is not required. A contrary interpretation would not only render subcontractor listing requirements largely superfluous,

---

own admissions to have engaged in some post-award negotiations and decision-making.

**11.** This was also the reasoning of District's purchasing agent. Of course, District's willingness to adopt the "no harm, no foul" approach is colored by its desire to get the lowest contract. Once it assures itself no actual bid shopping occurred (even if it were only because of Ray Bell's protest), its incentive to find the lowest bid unresponsive must have been greatly diminished.

**12.** New Mexico rejected a similar argument upon a contractor's contention it should be relieved of complying with certain bidding statutes when there is no "real risk" of bid shopping or peddling because an agency hearing is required.

If the legislature believed that the hearing before the using agency. would be adequate to determine whether or not there had been bid shopping or peddling, then there would be little point to listing subcontractors in the first instance. The using agency would simply make an individualized determination in each case regarding whether bid shopping or peddling had occurred. The Act's listing requirement, however, together with the strict limitation on substitution or subcontractors, establishes that the legislature was not willing to rely on after-the-fact inquiries into bid shopping or peddling. Rather, the legislature adopted prophylactic measures which greatly reduce the opportunity for bid shopping or peddling and thereby avoid the delay and expense of fact-finding regarding the existence of those practices. We should resist adopting an interpretation of [the statute] that undermines the value of these prophylactic measures.

*Dynacon, Inc. v. D & S Contracting, Inc.*, 120 N.M. 170, 899 P.2d 613, 618–19 (Ct.App.1995).

but would create practical difficulties in light of the time and proof restrictions envisioned by the procurement scheme. Aggrieved parties must protest bids within fifteen days after the notification of award is posted; and bid shopping only occurs after an award is made. Considering that the decision of responsiveness should be made before a contract is awarded, it would seem impossible to make the issue depend on whether bid shopping or other unethical behavior ultimately occurred. We find the legislature would not have intended such an illogical application. The statute has uniform listing requirements which, when followed, greatly diminish the opportunity to shop bids. Eradicating opportunities to engage in unethical behavior is clearly what the legislature has decided to police. Because Kahn's bid form gave it such an opportunity, it ran afoul of section 11–35–3020(2)(b).

## II. Waiver

██ District has the authority to waive minor informalities or irregularities in a bid. Its Procurement Regulations define "minor informality or irregularity" as "one which is merely a matter of form or is some immaterial variation from the exact requirements of the invitation for bids, having no effect or merely a trivial or negligible effect on price, quality, quantity, or delivery of the supplies or performance of the services being procured, and the correction or waiver of which would not affect the relative standing of, or be otherwise prejudicial to bidders." The master found that even if Kahn's bid listing did not comply with the statutory bidding requirements, District had the discretionary authority to waive such noncompliance. It again based its decision on its finding that ultimately no bid shopping actually occurred. The circuit court affirmed the master's ruling.[13] Ray Bell argues this was error. We agree. For the following reasons, we find the violation in this case was material and could not be waived.[14]

---

13. The Court of Appeals, in light of its interpretation of section 11–35–3020, did not address this issue.

14. The question of whether a variation is material is normally a question of fact. 72 (Supp.) C.J.S. *Public Contracts* § 13 (1975). However, our ruling is not grounded on individual fact determinations. Rather it is a finding that, as a matter of law, District has no authority to waive the statutory bidding requirements in this case.

While we have found no South Carolina authority directly on point, courts from other jurisdictions have held noncompliance with bid listing statutes material and non-waivable. *See generally* 64 Am.Jur.2d *Public Works & Contracts* § 62 (1972) (mandatory statutory requirements cannot be waived).

> Essentially this distinction between conditions that may or may not be waived stems from a recognition that there are certain requirements often incorporated in bidding specifications [that] by their nature may be relinquished without there being any possible frustration of the policies underlying competitive bidding. In sharp contrast, advertised conditions whose waiver is capable of becoming a vehicle for corruption or favoritism, or capable of encouraging improvidence or extravagance, or likely to affect the amount of any bid or to influence any potential bidder to refrain from bidding, or which are capable of affecting the ability of the contracting unit to make bid comparisons, are the kind of conditions [that] may not under any circumstances be waived.

*Meadowbrook Carting Co. v. Borough of Island Heights*, 138 N.J. 307, 650 A.2d 748, 751–52 (1994). *See also George & Lynch, Inc.*, 465 A.2d at 351 ("the contract should never be awarded on the strength of a promise that the statutory conditions restricting the very right to accept a bid will be satisfied subsequent to its acceptance"); *Haddock v. Board of Pub. Educ.*, 84 A.2d 157, 161–62 (Del.Ch.1951) (multiple listing of alternative subcontractors could not be a technical irregularity "in light of the special requirements of the statute" making subcontractor listings a condition precedent to receiving award); *Neilsen & Co. v. Cassia*, 96 Idaho 763, 536 P.2d 1113, 1116 (1975); *Williams Bros. Constr., Inc. v. Public Bldg. Comm'n*, 243 Ill.App.3d 949, 184 Ill.Dec. 14, 20, 612 N.E.2d 890, 896 (1993), *cert. denied*, 152 Ill.2d 582, 190 Ill.Dec. 912, 622 N.E.2d 1229 (1993) ("an agency has no power to waive compliance with a requirement imposed by the legislature"); *Prismatic Dev. Corp.*, 564 A.2d at 1212 ("The failure to list the subcontractors in the manner prescribed by the statute is material and non-waivable").

Courts have adhered to this rule even when there is no actual harm done, if the deviation had the "capacity" to affect the competitive bidding process.

This court has required strict adherence to bidding requirements even where no harm to the public authority was shown; where the violation benefited the public; and where there was no showing of bad faith or corruption. There are, however, circumstances in which noncompliance with bidding requirements has been characterized as technical rather than substantive, as a minor deviation not requiring invalidation of a bid or a contract. The question is whether invalidation is necessary in order to fulfil the legislative purpose.

*Phipps Prod. Corp. v. Massachusetts Bay Transp. Auth.*, 387 Mass. 687, 443 N.E.2d 115, 118 (1982) (internal citations omitted). In *Conduit*, the court discussed the issue of whether listing alternative subcontractors is a waivable defect:

> Although there is no evidence that [the low-bidding contractor] engaged in bid shopping, a problem as to the statutory requirement of open and equal competition occurs because the benefits from bid-shopping can be anticipated when a bidder intends to list several suppliers. Therefore, those benefits can be factored into the amount quoted on the submitted bid, a benefit all the other bidders reasonably believed would not be permitted in this case. Thus, the aberration in [the protested] bid is one allowing an opportunity for a Competitive advantage in preparing the bid.

401 A.2d at 379 (here, prohibition against alternative listing was not in statute but in bidding specifications). *See also Meadowbrook*, 650 A.2d at 755–56 (bidder's failure to include consent of surety in its proposal non-waivable, even though cured four days later, because it had the "capacity to affect the fairness of the bidding process," "even though it is evident that in fact there was no corruption or any actual adverse effect upon the bidding process").

We find allowing the subcontractor listing requirements to be waived in this case would frustrate the purpose of the legislature in enacting the statute. Therefore, Kahn's failure to properly list subcontractors as required by section 11–35–3020 was a material violation of the bidding requirements and was not waivable by District. Kahn's bid was therefore unresponsive.

For the foregoing reasons, we reverse the Court of Appeals' decision in this case and remand for further proceedings consistent with this opinion.[15]

**REVERSED AND REMANDED.**

FINNEY, C.J., TOAL, MOORE, and BURNETT, JJ., concur.

---

**15.** Although Ray Bell originally sought a re-award of the contract, it is now only seeking reimbursement costs and attorneys' fees. Kahn additionally argues that because the master found Ray Bell's own bid unresponsive, it does not have standing in this case. We disagree with Kahn's interpretation of the master's order. A close reading shows any language referring to Ray Bell's bid was purely hypothetical in nature. Under the factual circumstances of this case, we decline to find such language amounted to a final, dispositive ruling.